LittletoN, Judge,
delivered the following opinion:
Plaintiff sues to recover either active duty pay or, in the alternative, disability retired pay from October 14,1945, on the ground that the Secretary of the Army acted arbitrarily, capriciously, unlawfully, in disregard of the record, the undisputed facts, and the applicable regulations, when plaintiff was released from active duty by reason of psychoneurotic disability which the Department of the Army, through its retiring boards and a disability review board, had found existed prior to plaintiff’s entry on active duty in 1942 and was not aggravated by such active duty, and that plaintiff was not incapacitated by reason of service-incurred chronic bronchitis. It is plaintiff’s contention that the records before the Army boards, as well as the record which he has produced in this court, conclusively show that prior to his being commissioned in 1942 as a captain in the Army of the United States, he was a normal, healthy and well-adjusted man who had never displayed any symptoms of chronic bronchitis or of psychoneurosis, but that during his tour of active duty as a commissioned officer in World War II he incurred, as an incident of such service, chronic bronchitis and psychoneurosis, both of which permanently incapacitated him for further active duty.
*607 The defendant appears to question the jurisdiction of the court to determine whether or not the acts and decisions of the retiring boards and the disability review board in plaintiff’s case were arbitrary, capricious and not supported by the facts contained in the records before them. We have decided in a number of cases recently that the court does have jurisdiction to make such a determination in deciding whether or not the plaintiff was illegally deprived of a statutory right to disability retired pay. San Millan v. United States, 139 C. Cls. 485; Suter v. United States, 139 C. Cls. 466, cert. den. 355 U. S. 926; Friedman v. United States, 141 C. Cls. 239, and Patterson v. United States, 141 C. Cls. 435. On the question of the jurisdiction of the United States District Court to render judgments declaring void the determinations and actions of the Secretary of the Army in connection with a military discharge, see Harmon v. Brucker, 355 U. S. 579 and Abramowitz v. Brucker, 355 U. S. 579, both decided on March 3, 1958. The Supreme Court in both cases ruled in favor of the jurisdiction of the district court. In view of the holdings relative to jurisdiction contained in the cited decisions, we shall not discuss the matter further in the instant case and shall pass to the question of Whether or not the actions of the retiring boards and the disability review board herein were so arbitrary, capricious, and unsupported by the record evidence that the plaintiff was illegally denied disability retirement with pay under applicable statutes and Army regulations.
The specific actions of those boards of which plaintiff complains relate: (1) to the holding that at the time of his release to inactive duty in 1945, plaintiff was not incapacitated by reason of service-incurred chronic bronchitis; (2) to the holding that plaintiff’s psychoneurosis which was held to have permanently incapacitated plaintiff for further active duty as of the time of his discharge in 1945, was not incurred while serving on extended active duty in World War II, but was an incapacity which plaintiff had incurred at some time prior to entry on active duty in 1942, and that the symptoms which manifested themselves in connection with his nervous breakdown in December 1944 and January 1945, and have continued to manifest themselves since that *608 time, were merely recurring episodes of a preexisting chronic nervous disorder.
In view of the facts clearly established by the unoontra-dicted evidence concerning plaintiff’s life up to the time he suffered his breakdown in 1944 while in the service, we agree with the plaintiff’s contention that prior to his being commissioned in 194-2 as a Captain in the Army he was a normal, healthy and well adjusted man who had never displayed any symptoms of chronic bronchitis or psychoneurosis. He had an outstanding record of service as an officer in the Army as shown in the findings. It is also shown by the record that all of the facts relating to plaintiff’s past life and history and his record and service in the Army up until the time of his breakdown and release from the service without retirement were before the retiring boards, or were readily available to them, and were certainly before the Disability Review Board which considered plaintiff’s case in 1948.
The detailed facts of plaintiff’s civilian and Army life are set forth in the findings of fact and will be referred to only in a general way.
Plaintiff was born in 1902 in Texas. He had a normal boyhood and was an outstanding student in high school. In 1918, when he was approximately 16 years of age, he enlisted in the Texas National Guard in which he served until January 1919 when he was honorably discharged and moved with his parents to another part of Texas. He then completed high school, continued for a year of postgraduate work, and entered business college in 1922 (findings 3 and 4). At about this time it became necessary for the plaintiff to contribute substantially to the support of his family and in order to do so he took full time jobs and went to school at night. During the 1920’s plaintiff qualified for and obtained a commission in the Infantry Officers Reserve Corps and served on various active duty assignments until his commission expired in 1938 (finding 4). Plaintiff was employed in several civilian positions during this period and did well in all of them. The uncertain state of business during the depression years necessitated a number of employment changes and on a few occasions, which will be referred to later herein, plaintiff obtained employment as a merchant *609 seaman on voyages abroad and to Mexico. He held one Civil Service position with the Border Patrol during this period. In connection with plaintiff’s Army service and his Civil Service position he underwent a number of physical examinations, all of which found him to be normal both physically and mentally. He was married in 1931 and obtained an uncontested- divorce in 1934. He remarried in 1941 and that marriage was a successful one.
In 1942 plaintiff obtained a commission as a Captain in the Army and entered on active duty in September 1942. He underwent the necessary physical examinations in connection with his commission and he was found to be normal in all respects. His active duty career in the Army during World War II from September 8, 1942 to December of 1944 is described in detail in our findings 10 through 16, inclusive. His record of service during that period of time was excellent in all respects. During 1943 he evidenced the first symptoms of bronchial trouble (finding 12).
In September 1944 plaintiff began the most arduous part of his duties in World War II when he was assigned and served as highway control officer of the Seine Section Transportation Office in Paris. This work, which is described in our finding 14, required him to be on duty from 16 to 18 hours a day seven days a week and his performance was uniformly rated as excellent. By this time he had been promoted to the rank of Major. In November of 1944 plaintiff was detailed as regular defense counsel to a general court martial convened in Paris, although plaintiff was not a lawyer and had never had any legal training or experience. He was not relieved of any of his highway duties and the combined assignments required him to work on many occasions for 24-hour stretches. Opposing counsel in the many cases in which plaintiff served as defense counsel were experienced lawyers and the men whom he was required to defend were usually charged with major offenses (finding 16). In December 1944 plaintiff began to suffer from nervous collapse. He attempted to secure help from Army medical officers and was hospitalized on several occasions (see findings 17 through 21). In between hospitalizations plaintiff continued with his highway work and his assignments as *610 defense counsel and his physical and mental condition steadily worsened. Finally, in February 1945, plaintiff was evacuated to the United Kingdom and in March 1945 he was hospitalized at Camp Butner, North Carolina, as an overseas evacuee for determination of neuropsychiatric status and fitness for duty.
Plaintiff remained in the hospital in North Carolina from March 1945 to August 18, 1945. During that time he received no treatment and was interviewed only once by a psychiatrist assigned to his section of the hospital, a Captain Friedman, for one and a half hours (finding 23). After appearing before a disposition board in June 1945, plaintiff’s possible retirement for service-connected disability was considered by three different retiring boards. The details concerning these hearings and the conclusions reached by the boards are to be found in findings 24 through 34, inclusive. All of the boards found that plaintiff’s psychoneurotic condition was incurred prior to his entry on active duty in 1942 and that he was not entitled to disability retirement with pay. The hearings in each case were very brief and plaintiff was present only at the first proceeding. The findings and conclusions of all three boards were based primarily on a report of Captain Friedman, the medical witness who testified at the first and second retiring boards. The retiring boards did not take into consideration plaintiff’s bronchial condition. Ultimately plaintiff’s case was considered by the Army Disability Review Board in May 1948 (finding 37). Plaintiff appeared before this board and was represented by counsel. By this time he was able to secure affidavits and statements from many officers and men who had served with him in World War II and who were not available to give such statements in connection with the retirement board proceedings. He also secured statements and affidavits of qualified psychiatrists and presented testimony of one of the psychiatrists who had examined him. He also presented expert medical testimony and evidence concerning his bronchial condition. The Disability Review Board reversed some of the findings of the former retiring boards but concluded, as had those retiring boards, that plaintiff’s psycho-neurotic incapacity had been incurred prior to his entry on *611 active duty in 1942. It is apparent from the ..record that the Disability Review Board relied more on .the medical report of Captain Friedman than it did on the voluminous record presented by the plaintiff and on the material concerning plaintiff’s military career contained in his 201 file which was before all the boards. The Board also concluded that plaintiff was not permanently incapacitated by reason •of chronic bronchitis. Plaintiff’s application for a rehearing by the Disability Review Board was denied in January of 1951.
Since the report of Captain Friedman presented to the first retiring board is echoed by the findings and conclusions of all the boards which considered plaintiff’s case to the complete exclusion of all other evidence in those records, that report has been set forth in full in our finding 25. We shall discuss the highlights of that report and attempt to show how they either reflect or fail to reflect the record which was before the various boards in plaintiff’s case. The report states that plaintiff’s past medical history is noncontributory to his psychoneurotic condition, then described as simple adult maladjustment. This statement is certainly true since none of the numerous Army and Civil Service physical examinations undergone by plaintiff indicated any neurotic •disorder whatsoever. The report states that plaintiff “has had a long history in the past of turbulent emotional episodes accompanied by excessive alcoholism” and that “his background reveals a number of turbulent and unusual episodes.” As examples of these so-called episodes, the medical witness noted that plaintiff had acknowledged having had an “illicit” love affair with a school teacher when he was only 12 years ■of age. Plaintiff was not asked to explain the nature of this love affair by the retiring board, but in subsequent proceedings plaintiff testified, and his testimony is uncontra-■dicted, that the affair amounted to a schoolboy crush on an attractive teacher. The next episode described in the report was plaintiff’s enrollment at the age of 15 years in the Texas National Guard, having misrepresented his age. In later proceedings plaintiff explained that the Texas National ■Guard officers were quite aware of his age (nearly 16) at the time of his enrollment, were apparently glad to have his *612 services, it being then 1917 and the country at war with Germany, and that when his family moved away from the area, he was permitted to leave with them. The next episode referred to in the report was that at the age of 20, following a setback in a love affair, plaintiff roamed the world for several years and drank heavily. The record shows that at the age of 20, which was in 1922, plaintiff had just completed his postgraduate course in high school under circumstances which have been described in finding 3. As noted above, plaintiff immediately commenced studies in accountancy at the Alvin (Texas) Business College and also obtained employment as a part-time clerk. When, in 1923, plaintiff’s family suffered severe financial reverses, plaintiff commenced full-time employment with the same company and continued in such employment until 1926. Plaintiff’s first “roaming” took the form of a voyage by sea to Mexico in 1927, and immediately upon his return, plaintiff began a successful career as a salesman and sub-dealer in automobiles in Galveston and Texas City (finding 4). In 1930 plaintiff’s employer failed in business and plaintiff secured employment as a merchant seaman on a ship bound for Italy as described above. Plaintiff appears to have enjoyed his work as a merchant seaman but he did not indulge this taste again until 1940 when his then employer, a Mr. Bullard, suffered severe reverses in his business and could not afford to keep plaintiff working on a full-time basis. Accordingly, when Mr. Bullard’s business was particularly slack, plaintiff made several coastal trips to Mexico as a merchant seaman and one extended trip, for the dual purpose of qualifying for an expensive plastic surgery operation at the Marine Hospital and earning the very high wages which he was paid in order to continue supporting his family while he was hospitalized. There is no indication in the record before any of the boards that plaintiff drank heavily during any of this time. Plaintiff’s drinking habits have been dealt with in finding 8 and he could scarcely be characterized as an alcoholic or a problem drinker.
The medical report also found significant the fact that plaintiff’s first marriage in 1931 ended unsuccessfully after three years and the report stated, without any evidence what *613 soever, that following his separation from his wife in 1934 he began to drink excessively and lived a restless, disorganized and wandering life for the next six or seven years. The circumstances of plaintiff’s first marriage and his in-law problems, have been described in finding 8. Finally, the medical report states that plaintiff admitted to having gone around with a number of French women while based in Paris in 1943 and that he felt his doing so had contributed to his condition because he felt very guilty about such goings on. When finally asked to testify on this matter, plaintiff stated that the French women in question were intelligent and delightful companions and that he had never felt in the slightest degree guilty about his associations with them.
While some of the above information, which completely refutes the noted statements in the medical report, may not have been known to Captain Friedman, such information was certainly available to Captain Friedman and to the retiring board. And it should have been obvious to the doctor and to the board that the statements made in the medical report were far too general and sweeping in scope and quite unsupported by specific examples and incidents. Although the retiring board proceedings indicate that plaintiff’s complete 201 file was before the board, the conclusion is inescapable that the board and Captain Friedman paid very little attention to his superior military record, both in the reserve and while on active duty, and made no attempt whatsoever to ascertain a complete and accurate picture of plaintiff’s civilian life about which the report makes such broad general statements. In fact, the hour and a half psychiatric examination undergone by plaintiff at Camp Butner, North Carolina, was superficial in the extreme and the clinical abstract prepared for the disposition board and the medical report prepared by the medical witnesses were inaccurate, misleading, and wholly unsupported by official Army documents contained in plaintiff’s 201 file and the facts of plaintiff’s life prior to 1942 which were readily available to the medical witnesses and the boards.
On the basis of the evidence which was before the various boards which considered plaintiff’s claim for disability retirement with pay, the conclusion that plaintiff incurred his *614 psychoneurotic disability prior to Ms entry on active duty in 1942 was arbitrary and capricious and not supported by anything in the record before those boards except the superficial and inaccurate report of Captain Friedman.
We are of the opinion that the boards which considered plaintiff’s case disregarded.the Army regulations in connection with the basic provisions for determining whether or not a disease sustained by a military person was incurred in line of duty. Those regulations contained in AR 40-1025 prescribe a strong presumption of service-incurrence “unless there is substantial evidence to show that such disease or injury * * * existed prior to the individual’s current active service and was not aggravated by the service.” The regulation provides that an Army patient will be presumed to have heen in sound condition upon entering active service unless the disease or condition which brought about the disease “were noted in the patient’s physical examination upon entrance into the service, or unless clear and unmistakable evidence * * * demonstrates that the injury or disease, or the condition which caused the disease, * * * though not noted, existed prior to the patient’s active service.” The regulation further provides that even where the existence of the condition prior to service has been established, only specific findings of “natural progress” of the disease based on well-established medical principles can overcome the presumption of service aggravation. The regulation contains specific provisions for the guidance of retiring boards in psychiatric cases for determining whether a psychiatric disorder was incurred in line of duty. The regulation provides that where there is no evidence of the disorder prior to entry into service, and even in cases where some pre-disposition is shown to exist but not the disease itself, the disease will be considered to have been incurred in line of duty. The regulation provides that the disease will be considered to be not in line of duty where available evidence “clearly indicates” the existence of the disease prior to entry into the service and that the disease was not aggravated by the service.
In plaintiff’s case the available evidence clearly indicated no disorder of a psychoneurotic nature prior to his entry on extended active duty in 1942. Testimony and affidavits of re *615 sponsible psychiatrists was to the effect that plaintiff showed no pre-disposition to psychoneurosis prior to December 1944. No symptoms of bronchial trouble or of unusual neurotic behavior problems or reactions were noted in plaintiff’s physical examination upon his entry into the service in 1942, and there is no evidence in the record before any of the boards that, although not noted on the examination, a bronchial or psy-choneurotic condition existed in plaintiff prior to his extended active service which commenced in September of 1942. The findings of the retiring boards and of the Disability Review Board did not include any specific findings of “natural progress” of the disease of'psychoneurosis “based on well-established medical principles.” We are of the' opinion that on the basis of the record before the various boards which considered plaintiff’s claim of service-incurred disability, no evidence was adduced which served to rebut the presumption of service incurrence in this case and plaintiff should have had the benefit of the presumption provided for in the Army regulations.
In the trial in this court, plaintiff submitted in addition to the record of the proceedings before the retiring boards and the Disability Review Board, testimony and exhibits upon the basis of which the commissioner of this court made findings. Defendant has objected to such findings as a basis for holding that the actions of the board were arbitrary. The contents of such testimony and exhibits, however, added very little to what was already before the Disability Review Board in 1948 and also before the board in connection with plaintiff’s motion for a rehearing^ Aside from evidence of plaintiff’s condition during the period of time subsequent to the motion for a rehearing in 1950, the material submitted in the instant case is the samé as the material presented to the Disability Review Board, or is merely cumulative in effect. In the sense complained of by the defendant, therefore, plaintiff has not had a trial de novo and the case could easily have been decided without the additional evidence presented before the trial commissioner of this court, and that decision would be the same, whether the additional material were before us or not. Wé are aware of the statements made in earlier decisions and *616 called to our attention by the defendant to the effect that this court prefers not to sit as a medical board and act in an expert capacity in deciding technical medical matters. It has not been necessary in the slightest degree to do so in this case. The record herein speaks only too clearly to the unskilled lay observer and we venture to suggest that in view of the number of cases of this kind which have come before the court in recent years, this court is no longer the most unskilled body of lay observers. Were, we to refuse to pass on difficult technical questions, even after having the benefit of qualified expert testimony, as defendant appears to suggest we should do, we should long since have had to abdicate our jurisdiction in a number of areas such as patent, Indian, complicated engineering contract disputes, and certain types of valuation cases.
Insofar as the retiring boards which considered plaintiff’s case were concerned, their composition included in each instance only two medical officers, each board consisting of five members. There is no indication that the medical members were qualified psychiatrists, radiologists, or specialists in the field of respiratory ailments. Those boards had to rely on the expert testimony of medical witnesses who had presumably examined plaintiff and were qualified to evaluate the particular incapacities from which he was supposed to be suffering. In a close case we should, of course, be inclined to give great weight to the findings and conclusions of such boards, but we are persuaded that this was in no sense a close case.
We are of the opinion that the Army retiring board and the Disability Review Board, acted arbitrarily, capriciously and in a grossly erroneous manner, in disregard of the overwhelming evidence before such boards, and to a certain extent, in violation of Army regulations, particularly those relating to presumptions of service connection, in denying plaintiff retirement for physical disability consisting of service-incurred bronchitis and service incurred psychoneurosis.
Plaintiff was entitled to retirement for service-connected disability. In view of what we have said and in light of the uncontradicted evidence of record and the findings herein, the plaintiff is entitled to recover disability retired pay appli *617 cable to an officer of his rank from the date of his release to inactive duty on October 14, 1945, and judgment will be entered to that effect. The determination as to the amount of recovery will be made pursuant to Buie 88 (c).
In connection with plaintiff’s alternative claim for active duty pay, it appears that plaintiff was released to inactive duty in a perfectly legal and authorized way, although the decision of the Army that plaintiff was not entitled to disability retirement with pay on the occasion of such release to inactive duty was arbitrary and illegal. In view of the fact that his release to inactive duty was legal and that he was totally incapacitated for further performance of that duty, we are of the opinion that plaintiff is not entitled to recover active duty pay from October 14,1945. See Womer v. United States, 114 C. Cls. 415 and Register v. United States, 131 C. Cls. 98.
It is so ordered.
Madden, Judge, concurs.
Laramore, Judge; Whitaker, Judge; and JoNes, Chief Judge, concur in the result.
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner Bo aid A. Ilogenson, and the briefs and argument of counsel, makes findings of fact as follows:
1. Plaintiff is a citizen of the United States and a resident of the State of California.
2. By agreement of the parties, approved by the commissioner, the trial of this case was limited to the issues of fact and law pertaining to the right of the plaintiff to recover.
3. Plaintiff was born October 6, 1902, at Cistern, Texas. By misrepresenting his age, he enlisted in the Texas National Guard in September 1918, and served as an enlisted man until January 1919, when he was honorably discharged upon his moving with his parents to Brazoria County, Texas. He graduated from high school at Alvin, Texas, in June 1921, where he played on the football, basketball, baseball, and track teams, was a member of the debating team, and participated in the state finals of the Texas Interscholastic meet *618 for two years, served as president of bis class in 1919-20, and as president of the student body in 1920-21. Following his graduation, the Superintendent of the high school, who was also the athletic coach, persuaded plaintiff to attend the Alvin High School for a year as a postgraduate student, since under the rules of the Texas Interscholastic League, he was still eligible to play football and was also eligible to take part in interscholastic debates and certain literary activities, in all of which plaintiff excelled. In connection with plaintiff’s high school career which extended from 1917 to 1922, Mr. J. O. Webb, Assistant Superintendent in charge of high schools in the Houston Independent School District, submitted an affidavit dated August 21,1947, in which he stated that plaintiff was a high school student under his instruction at Alvin, Texas, and that he knew plaintiff to be a normal, industrious, and worthwhile individual who not only “did his high school subjects” but also found time to represent the high school in debating and other school activities.
4. Upon leaving high school in 1922, plaintiff studied accounting at Alvin Business College for about one year, during which time he was employed part-time as a clerk by the Southern Food and Produce Company. At about this time plaintiff’s family suffered financial reverses which necessitated plaintiff’s taking a full-time job and contributing to the support of his family which he continued to do for many years thereafter. Accordingly, in 1923 he commenced full-time employment by the same company as a clerk and secretary and continued in such employment until 1926.
In the meantime, plaintiff had attended Citizens Military Training Corps encampments in 1923 and 1924, graduated from the prescribed course, and obtained a commission as second lieutenant, Infantry, Officers Beserve Corps, in October 1924. In connection with the obtaining of this commission plaintiff underwent a physical examination by Army authorities and the report of that examination indicated that he was normal in all respects.
Plaintiff’s employment at the Southern Food and Produce Company terminated when he enlisted in the Begular Army on February 4, 1926. His purpose in enlisting was that he might be advanced on the eligible list for appointment as *619 a flying cadet. Serving until early September 1926, he was appointed as a flying cadet, and attended primary flying school, bnt was honorably discharged on October 30, 1926, for' failure to make satisfactory progress in flight training, his disqualification being characterized by the reviewing board as lack of inherent ability to fly.
Following his discharge, plaintiff was employed for a few months until 1927 as an accountant and clerk by an insurance agency, J. B. Collins Company, at San Benito, Texas. In 1927, plaintiff made a short sea voyage to Mexico and return as a merchant' seaman employed on a tanker. He then became a salesman and sub-dealer in automobiles in Galveston and Texas City, Tex, in which occupation he enjoyed considerable business success and continued until 1930. In 1930, plaintiff left the automobile business because depressed business conditions made it difficult for him to earn a living. He then made a voyage to Italy as a merchant seaman, spent about a month in Genoa, Italy, while his ship was at dock, and returned by the same ship in early 1931.[1]
In April or May 1931, plaintiff took an examination for appointment in the United States Border Patrol Service and was appointed a'patrol inspector in July 1931, serving until his resignation without prejudice was accepted effective December 9, 1933. In connection with plaintiff’s appointment to a position in the United States Border Patrol Service he underwent a thorough physical.examination which disclosed *620 no abnormalities whatsoever either physical or mental. At the time of his resignation, he was on military leave, serving as commanding officer of an encampment in the Civilian Conservation Corps. His salary in his grade as a captain was about double that of patrol inspector. His active duty with the C. C. C. had been somewhat extended, and while the District Director of the Border Patrol recognized that plaintiff’s services had been superior, objected to his absence from duty on military leave. Plaintiff submitted his resignation which was accepted. He remained on active duty in the Army on the C. C. C. assignment for about another month, when he was released from active duty in accordance with a rotation plan instituted in his Army Corps area.
Immediately after plaintiff’s release from active duty early in 1934 he went to work for Crawford Motor Company, Donna, Texas, as a bookkeeper and automobile salesman and continued such employment until the failure of the company in the latter part of 1937. After working with his parents for a few months on a small citrus grove and dairy farm near Donna, Texas, plaintiff went to California in search of employment in early 1938.
Plaintiff secured employment in 19318 as an accountant and later as operations manager for Bullard Trucking Company, an independent trucking concern located at Maywood, California, and continued on a full-time basis until December 1940. Plaintiff was a close personal friend of Mr. Bullard and when Mr. Bullard’s business declined in volume and became intermittent, plaintiff sought and obtained other work during such slack periods. From December 1940 to January 1942 he continued to do spare time work for Bullard. Sometime prior to 1940 plaintiff had suffered a severe burn on his leg which necessitated plastic surgery. Because his services were not required by Mr. Bullard at this time and in order to make himself eligible to have this expensive operation performed at the Marine Hospital in San Francisco, plaintiff again went to work as a merchant seaman on tankers in the employ of General Petroleum Company and the Hillcone Steamship Company. He made several coastwise voyages as a merchant seaman at a relatively high rate of pay and this additional marine service qualified him for the operation at *621 the Marine Hospital to remove the scar tissue from his leg. After this operation had been performed and while still performing occasional work for Mr. Bullard, plaintiff obtained seasonal employment from September to November 1941 with the California Walnut Growers Association, Los Angeles, California, as foreman in their processing and packing plant. He then worked in January 1942 as an accountant for the Monolith Portland Cement Company. From February 1942 to September 1942, plaintiff for a higher salary was employed as auditor and operations manager of Airdrome Transport Company, Burbank, California, handling the ground transportation of airplane passengers to and from the airport. He remained with Airdrome Transport until ordered to active duty in the Army as described in subsequent findings.
5. In addition to plaintiff’s civilian employment described above in finding 4 and during the same period of time, plaintiff was active in the Officers Beserve Corps from 1924 to 1938.
After his appointment in 1924 as a second lieutenant, Infantry, Officers Beserve Corps, plaintiff was in May 1929 promoted to first lieutenant, and in June 1933 to captain. His commission as a reserve officer expired June 6, 1938. During the period 1924 to 1938, he performed active duty as a reserve officer as follows: Two weeks in the summer of 1925 as company officer at Fort Crockett, Texas; two weeks in each of the summers of 1929, 1930, and 1932 as company officer at Fort Sam Houston, Texas; from February 22 to May 24, 1933, student, the Infantry School, Fort Benning, Georgia; from July 10,1933, to January 15, 1934, company and battalion commander, Civilian Conservation Corps, Bastrop and Fort Sam Houston, Texas; for two weeks in the summer of 1935 as battalion commander at Fort Sam Houston, Texas; and for two weeks in the summer of 1937 as company commander, Citizens Military Training Corps, Camp Bullis, Texas.
Plaintiff was selected to attend the above-mentioned Infantry School, National Guard and Beserve Officers Course, Fort Benning, Georgia, as one of the two outstanding reserve officers in junior grade in his corps area. Plaintiff successfully completed this course. All of plaintiff’s service *622 as a reserve officer appears to have been of superior quality.
6. On September 2, 1942, plaintiff was commissioned captain, Coast Artillery Corps, Army of the United States, and promoted in June 1943 to major, A. U. S. He served on active duty from September 8, 1942, until October 14, 1945, when be was released from active duty under the circumstances related in subsequent findings. He was commissioned major, Honorary Reserve, August 28, 1950, and is now a major, U. S. A. ft., 'Honorary Reserve.
7. At the time of plaintiff’s entry on active duty as a commissioned officer on September 8,1942, he was found upon examination to be physically and mentally qualified, with no defects or disabilities disclosed. His respiratory and nervous systems were found to be normal. The chest X-ray indicated normal condition.
Previously he had undergone physical examinations conducted by the Army upon his original commissioning in 1924 in the Officers Reserve Corps, upon each of his tours of active duty as a reserve officer during the period from 1925 through 1937, upon three- occasions in 1926 in connection with his enlistment and service in the Army, upon each of his two promotions as- a reserve officer in 1929 and 1983, and when he first applied for a temporary commission on January 1, 1942. There were no defects or disabilities disclosed on any of these examinations, and his respiratory and nervous systems were found to be normal. The January 1,1942, examination report stated in part as follows:
X-ray' of chest shows: Normal heart and great vessel shadows. The apices are clear, diaphragmatic surfaces smooth and rounded, and costo-phrenic angles, normal. The lung fields are clear. There are a few small calcified nodules in both hilar regions. This constitutes roentgenological evidence, of healed primary type pulmonary tuberculosis. Tt is not now, and is not likely to become in th'é future, of any clinical significance.[2]
Plaintiff was also examined upon enlisting in the Texas National Guard in 1918, upon his appointment to the United *623 States Border Patrol in 1931, and in the -procedures of bis Selective Service Board in 1942, and upon various applications for life insurance. None of these examinations disclosed any defect or disability. The Border Patrol examination showed both lungs to be normal; The Selective Service examination report expressly stated that there were no defects, and plaintiff was classified for induction for' unlimited duty. '1
8. In connection with plaintiff’s personal life outside his business and military activities, plaintiff appears to have had a normal and relatively happy boyhood. ' His grandparents were of old Texas families and his-mother came from a fairly prominent and wealthy Texas family. His mother was an extremely strong character, inclined to dominate the family life. His father was of a more easy-going type: The plaintiff had an older brother who went to college and later became a certified public accountant and he appears to have been a favorite of the mother. During his earlier years the plaintiff was more closely attached to his younger brother than to his older brother. Ultimately, however, the plaintiff and his older brother became fast friends. Shortly after plaintiff graduated from high school in 1922 it became necessary for him to contribute substantially to the support of his family and this he did for many years. ■ For this reason it was not possible for him to complete college. In 1931, while plaintiff was serving with the Border Patrol, he married a girl some 4 or 5 years younger than himself. Shortly thereafter it became necessary for the plaintiff’s parents to come to live with plaintiff and his wife.-. A short time after that the parents of the plaintiff’s wife also joined what must have been a crowded household. In' 1934 plaintiff and his wife separated and plaintiff’s wife went to live with her parents elsewhere. The sister of plaintiff’s wife had died-and plaintiff’s wife appeared to feel that her place was with her parents. The marriage ended in an uncontested divorce. After plaintiff moved to California in 1938 he not only worked hard but appears to have played hard on various occasions. In connection with his application for a commission in the Army in World War II (1942) plaintiff submitted records concerning 2 arrests for drunkenness and 2 *624 for traffic violations, all taking place in California between 1938 and 1941. Plaintiff explained the arrests for drunkenness on the ground that he and a number of other young men made too much noise on parties on certain occasions, and that the arrests were more for disturbing the peace than for intoxication. He was not intoxicated in connection with either of the traffic violations. Plaintiff does not appear to have been a problem drinker prior to his entry in the Army in 1942 although he frankly admits he does not feel that he handles alcohol well and, having so decided, he became a complete abstainer from alcohol from 1941 to December of 1944. In 1941 plaintiff was married for the second time, to a woman who had a child by a previous marriage. His marriage to the present Mrs. Brown has been a successful and happy one and his relations with his foster child have always been excellent.
9. On the basis of the record as a whole, plaintiff was prior to his entry on active duty in 1942 a normal, healthy and well-adjusted individual, in his personal, business and military life, and he enjoyed a reputation for efficiency and level-headedness. He has always supported his family and contributed largely to the support of his parents. He has done well on his various jobs both before and during the depression, and his military service was always of a very high order of excellence. At one time he studied by correspondence to become a certified public accountant, but did not take the examination. However, he was able to secure employment as an accountant as a result of his studies and did very well on all jobs involving his services as an accountant.
10. Upon entering upon active duty on September 8,1942, plaintiff attended the Army Barrage Balloon School and satisfactorily completed the course of instruction on October 24,1942. He was then assigned to the 318th Coast Artillery Barrage Balloon Battalion at Camp Tyson, Tennessee as battery commander. On May 4,1943, he was assigned as executive officer of this battalion by his commanding officer who, on May 27,1943, recommended promotion of plaintiff to major to fill the position of executive officer, certifying that plaintiff had clearly demonstrated his fitness for the responsibilities *625 and duties of the position and grade for which he was recommended, advising that plaintiff’s performance of duties had been uniformly excellent, stating the belief that he was the best fitted officer available in the command for the grade and position to which promotion was recommended, and further stating in part as follows:
This officer is very tactful, reserved and has exhibited excellent leadership. He performed the duties of a Battery Commander in an excellent manner during the trying period of activation from Dec. 10,1942 to May 8, 1943. Since May 4, 1943, Captain Brown has functioned as Battalion Executive in an excellent manner and has therefore shown himself qualified in my opinion for the next higher grade.
This recommendation was approved through channels, and plaintiff was, on June 12,1943, promoted to major, Army of the United States.
All of the personnel under plaintiff’s command at Camp Tyson were men of the colored race, including the junior officers, the chaplain and the medical officer who was a Dr. Edward D. Crockett. All of the men under plaintiff’s command liked and respected him and considered him a very fair and fine officer. In this connection, the following excerpt is taken from an affidavit made by Benjamin G. Thornton, a colored noncommissioned officer who served with plaintiff at Camp Tyson.
I know for a fact that Major Brown was beloved by his troops and his officers, and Battery C was overjoyed when he came back to them as Commanding Officer. His coolness and good soldiering was manifested on many occasions, especially on the Bifle Bange. Nothing seemed to excite him very much. I am a colored man and the 318th was a colored unit in a Southern state, so it took the best kind of officers to do a good job. I remember when the 320th Battalion, which was right next to us at Camp Tyson, had a mutiny, and how Major Brown came out to camp from his quarters in a nearby town, that night, entirely unarmed, and coolly dominated a very tense situation in our own outfit by walking around as if nothing were wrong, and then going to sleep in the orderly room. Our boys who were very nervous and didn’t know what might happen in the way of mob action by the Tennessee people, after seeing Major Brown on *626 •the scene, just quieted right down and seemed to know if he was present everything was alright.
During all my Army service, I never came in contact with as good an officer as Major Brown. I think it was common knowledge that he was the best soldier in Camp Tyson Center, and he could march better, shoot better and lead in everything. :
Dr. Crockett, who also served with plaintiff at Camp Tyson,, testified that although he was never called upon to examine or treat plaintiff during their service together, he was of the opinion that plaintiff was normal both physically and mentally. If plaintiff had required treatment at that time, he would have gone to Dr. Crockett for such treatment.
11. As noted elsewhere in these findings, plaintiff underwent a number of physical examinations by the Army and the Border Patrol prior to his entry on active duty as a commissioned officer in September 1942, including three physical examinations in 1942. In connection with some of these examinations, and particularly in connection with his examination for his commission in 1942, chest X-rays were taken which revealed no evidence of pleural thickening, adhesions,, or increased tissue density in the right apex of his lung.
12. On November 19 and 20, 1943, while serving with the Barrage Balloon Battalion, plaintiff was treated at the 318th Dispensary for naso-pharyngitis, catarrhal, acute, recorded by the examining doctor as incurred in line of duty. From November 23 to 25,1943, he was hospitalized at Station Hospital, Camp Tyson, Tennessee, where his condition was recorded as enterocolitis, acute, catarrhal, cause undetermined, incurred in line of duty. The hospital record stated in part, as follows:
Radiologic report, 23 November 1943: Posterior anterior X-ray of the chest shows the heart within normal limits and size. There is a marked increase in his hilar shadows and peribronchial markings. There are evidences of pleura! thickening and adhesions, especially in the left costophrenic recess. There is some increase in tissue density in the right apex. This is compatible with an old chronic bronchitis with pleural adhesions.. There is no evidence of any active pulmonary pathology..
The above quoted report is the first one in plaintiff’s medical history which indicates any bronchial abnormality existing *627 in plaintiff’s chest region. All of the testimony offered by plaintiff, by medical witnessés, or by affidavits of physicians,, is to the effect that if in 1943 plaintiff had had chronic bronchitis, the pleural thickening and adhesions characteristic of that condition would have shown up on the 1942: X-rays taken in connection with his application for a commission. The medical testimony herein indicates that the expression “compatible with” used in the above-quoted hospital record does not mean that the doctor making the report was stating that plaintiff had had chronic bronchitis.
Plaintiff was returned to duty on November 25,1943, with his condition noted on the hospital record as improved.
Prior to plaintiff’s attacks of what was probably acute bronchitis at Camp Tyson, Tennessee, in 1943, the then commanding officer was very insistent that officers remain on duty unless completely incapacitated. In accordance with that policy the' plaintiff, although ill with a severe cold and running a fever, had reported and remained on duty. His attack and the X-ray resulting in the above-quoted report were subsequent to this incident. The extremes of temperature in that part of Tennessee during that winter were great and plaintiff, being very conscientious, worked outdoors in all .kinds of weather and regardless of his state of health.
13. On February 14, 1944, plaintiff was transferred from the Barrage Balloon Battalion to the Transportation Corps, and after an orientation course, served from March 8, 1944, to December 26, 1944, as Motor Transportation Movement Officer in command of a Highway Section of the 13th Traffic Begulation Group. As a part of his duties, he was in charge of weapons training for the Group while it was still based in the United States, and his unit obtained a superior rating in markmanship. As a member of the Group,- plaintiff embarked for England in May 1944, and arrived there June 5, 1944. In England he served as a railway transportation officer at two gasoline and oil depots, and was in charge of movement of trains into and out of the depots.
■ 14. In September 1944, plaintiff was sent to France where he was assigned and served as Highway Control Officer of the Seine Section Transportation Office, Paris. His duties, which required him to work 16 to 18 hours per day for seven *628 days a week, involved priority control and planning and coordination of transportation of troops and supplies on the Bed Ball Highway through the Seine Section towards the front lines as far as St. Marne and Saint-et-Oise provinces. Plaintiff continued on this assignment until December 26,1944.
Plaintiff’s performance of duties in the Transportation ■Corps was uniformly rated as excellent. His reputation with his fellow officers and the men under his command was that -of an efficient, calm and hardworking individual. Plaintiff’s younger brother was at that time serving under General Patton and this fact caused plaintiff to feel an even greater •sense of urgency about routing supplies promptly to the front.
15. Plaintiff was hospitalized at 365th Station Hospital, Paris, France, from October 17 to 31, 1944, for bronchitis, •bilateral, acute, catarrhal, moderately severe, cause undetermined, noted by the examining doctor as incurred in line of •duty. Plaintiff again received medical treatment for bronchitis, acute, catarrhal, on December 1 and 2, 1944. These were the first occasions on which plaintiff’s respiratory trouble was definitely diagnosed as acute bronchitis.
16. On November 6,1944, plaintiff was detailed as regular ■defense counsel to a general court-martial convened in Paris. He was not a lawyer, had had no training or experience in the law, and had never served as trial judge advocate or defense •counsel before a court-martial prior to that time. Outside ■of two periods of hospitalization in December, plaintiff served .as the active defense counsel in 50 or more cases tried from November 6 to December 26, 1944, representing Army personnel charged with major offenses including capital crimes, black-market dealing, larceny, rape, desertion, sodomy, striking an officer, and other crimes. Heavy sentences were being passed as a matter of policy, and three or four of plaintiff’s defendants received sentences of imprisonment for 99 years. The officer who prosecuted most of the cases in which plaintiff was involved was a former District Attorney. In ■.all cases counsel opposing plaintiff were experienced lawyers -as were many members of the Court Martial Board. Plaintiff had three and sometimes four assistants to help him in the *629 preparation of the cases for trial but none of these assistants were lawyers or trained in the law in any degree.
During this entire period plaintiff was not relieved of his duties as Highway Officer, but endeavored to perform both assignments, and he consequently worked 18, and occasionally 24 hours per day. Plaintiff was deeply concerned about rendering as perfect a performance as possible on both his highway duties and his legal work. He felt a strong sense of responsibility toward the men he was defending and he believed himself to be inadequately trained to render the important services which had been thrust upon him. He often felt that if he had been more experienced or had had some sort of legal training, he could have done a better job for the men with whose defense he was charged, and he believed many of the sentences which were passed were too harsh and at times even unjust. He began blaming himself for this state of affairs. As time went on plaintiff experienced loss of appetite and was unable to sleep on the occasions when it was possible to do so. He began experiencing nausea and muscular pains in his back and neck. He worried constantly and began to find it more and more difficult to concentrate.
17. In early December 1944 plaintiff consulted a medical officer at an Army dispensary in connection with the above symptoms. The medical officer gave plaintiff a box of phenobarbital tablets and told him not to worry so much. After consuming some of these sedatives and finding that they only depressed him and did not help him to relax, plaintiff stopped taking the pills and returned to the same doctor for further help. On this occasion the doctor advised him that he was a “worry wart” and suggested that it might be a good idea if plaintiff went out on a “binge”. Along with two of his fellow officers plaintiff did go on a “binge”. As noted above, plaintiff had been a complete abstainer from alcohol since 1941. Probably for this reason and also because of the extremely low state of his vitality and his high state of tension, the “binge” was disastrous. His two fellow officers had to take bim to the 365th Station Hospital, Paris, where he was hospitalized from December 12 to 23, 1944. The diagnosis recorded by the medical officer was:
*630 L Alcoholism, acute. {Cured 15 Dec. 44).
2. Observation for psychoneurosis.
No disease found.
18. As will be noted from tbe dates above, plaintiff’s acute, alcoholism was cured in short order. The doctor recorded that the second condition was incurred in line of duty, but the first'was: not. , Plaintiff-was released from the hospital on. December 23,, 1944, for return to duty. ■ He went directly from the hospital to the courtroom of the general court-martial where he defended a person charged with desertion which.was.a capital crime under the circumstances. While-engaged in the trial of the next case, he was ordered on December 26, 1944, to Rheims, France, as a movements officer in connection with the break through at the Ardennes front.
. 19. Because of a fast pulse rate- and general nervousness, together with-a severe cold, plaintiff was sent as an emergency case to and remained as a patient at the 179th General Hospital, Rheims, from January 3 to 9,1945. His condition was-recorded as nasopharyngitis, catarrhal, acute, incurred in line-of duty, and he was restored to general duty on January 9. The report contained no information concerning plaintiff’s= nervous condition.
■.. 20. On his release from the hospital; plaintiff was ordered, back to Paris to read and sign numerous records of court martial proceedings in which he had participated as defense-counsel. He became ill shortly after his arrival, and was: hospitalized at the 365th Station Hospital, Paris, from January. 11 to 22, 1945, where his condition was diagnosed as. bronchitis, bilateral, acute, catarrhal, moderately severe,, cause, undetermined, noted again as incurred in line of duty.
21. Upon his discharge from'the hospital in Paris on January 22, 1945, plaintiff was assigned at the request of some-defendants as special defense counsel in a general court-martial, and-represented nine defendants in one trial. Pie-then commenced a second -trial representing three or four-defendants. Plaintiff was relieved of this assignment before-completion of the second-trial. At this time plaintiff was: Suffering increasingly, from loss-of appetite, insomnia, stiffness of the muscles of his neck, and he was depressed and', brooded over his experiences as defense counsel. At that *631 time he was, as was required of Mm, reviewing transcripts ■of the testimony and proceedings in some of the cases in which he had served. In a desperate attempt to find some way of relaxing, he commenced to drink alcoholic liquor heavily.
22. On January 29, 1945, plaintiff was admitted to the 108th General Hospital, Paris, with a diagnosis of “Psychoneurosis, character disorder, chronic, with anxiety depression and alcoholic excesses” and “hemorrhoids, external.” Evacuation of plaintiff to the United Kingdom was ordered in February, and he was taken from the hospital in Paris to ■a hospital center in England, where he remained one week, until he was ordered sent to the .Zone of the Interior, and finally arrived and was admitted to the U. S. Army General Hospital, Camp But-ner, North Carolina, on March 27, 1945, as an overseas evacuee for determination of neuropsychi-;atric status and fitness for duty. Plaintiff urgently requested that he be sent to a hospital near his home in California for treatment and evaluation, but his request was denied and plaintiff remained at the hospital in North Carolina until August 18,1945.
23. Except for general care, plaintiff received no treatment for his condition while at the Camp Butner Hospital. On one occasion, which occurred in April 1945, he was interviewed for one and one-half hours by Ur. Samuel Friedman, Captain, M. C., who was the ward officer in charge of plaintiff and other patients at the neuropsychiatric center of the hospital.[3] The other contacts which'plaintiff had with Captain Friedman were casual meetings in the hall or about the ward and in connection with some investigations by Captain Friedman as to how plaintiff obtained alcoholic liquor which he drank while a patient. Plaintiff was given a physical examination on one occasion by Dr. Morris J. Chernak, *632 Captain, M. C., who was not regularly assigned to the ward.
24. On June 5,1945, a disposition board met at the Camp Butner Hospital and considered plaintiff’s case. Captain Friedman presented a written report termed a “Clinical Abstract” concerning plaintiff, which, except for the statement with respect to a lung lesion, was substantially in the language of that part of the Beport of Medical Witnesses, hereinafter quoted in finding 25, headed “A. Medical History.” The disposition board diagnosed plaintiff’s condition as “Simple adult maladjustment, manifested by periodic episodes of emotional instability, excessive alcoholism and disorganized, turbulent behavior. Condition unchanged. Line of duty, no. Existed prior to service.” The disposition board further found that the date of origin of plaintiff’s incapacity was 1920, and that the date of his becoming unfit for duty was January 1945, and recommended that plaintiff be ordered to appear before an Army retiring board. Nothing in the clinical abstract identifies the incident in 1920 which led Captain Friedman and the disposition board to find that his incapacity originated at that time.
25. On August 16, 1945, an Army retiring board was convened at the Camp Butner hospital to consider plaintiff’s retirement from the service. The Board consisted of five Army officers, two from the Medical Corps. The board met at 9:10 a. m., heard and considered the case, and made its decision, and adjourned at 9:45 a. m. Plaintiff appeared in person but not by counsel. He stated that he did not desire counsel. The recorder submitted papers referred to the board by the Adjutant General, and these papers were inspected by plaintiff and read by the board. Captain Friedman, plaintiff’s ward officer, and Captain Chernak, who had examined plaintiff physically, were the duly designated medical witnesses, and Captain Friedman read and submitted the following :
REPORT OK MEDICAL WITNESSES
Brown, Morris B., Major, ASN 0205 227; T. D.
A. Medical History:
This 42 year old Major in Transportation Corps was admitted to the TJSA General Hospital, Camp Butner, *633 on March 27, 1945 as an overseas evacuee from ETO with chief complaint of nervousness, insomnia and excessive drinking.
The family history is negative for neuropathic dia-theses. Patient’s past medical history is noncontributory to the present situation. He has had two years of college and also attended Accounting School: he has been an auditor and was also engaged in the transportation business. He was married for the first time in 1931,. divorced four years later and remarried three years-ago. As to his military history, first joined the Texas National Guard at the age of 15 by misrepresenting his age ; he was originally commissioned in 1924 but this expired in 1936. He entered active service at the present time on September 8, 1942; served initially with a Barrage Balloon outfit until its deactivation and then was assigned to Transportation Corps. He went overseas in May 1944, arrived in France in August and remained there until his hospitalization in January 1945.
The patient has had a long history in the past of turbulent emotional episodes accompanied by excessive alcoholism. However the present episode began in November at which time he was serving as Defense Counsel in General Court Martial. Apparently he became upset about some of his experiences especially after he lost several cases. He became insomniac, nervous and again began to drink heavily. He also experienced some-somatic symptoms, such as stiffness in the neck muscles,, rapid pulse and nausea. He was hospitalized for a few days in the early part of January at Reins [sic] ; later when he returned to France his nervous symptoms and excessive drinking continued and he was finally hospitalized on January 29,1945. He was returned to the States with a diagnosis of psychoneurosis, character disorder,. chronic; with marked anxiety, depression and excessive-alcoholism, as manifested by past periods of disorganized rebellious living, characterized by wandering, tremulousness, drinking and by a recent period of agitation, depression, hyperactivity and excessive drinking, LOD no, EPTI.
During his hospitalization here the patient has presented certain problems from the standpoint of alcoholic bouts and acute intoxication on several occasions. Aside from these episodes he has not given evidence of gross psychiatric disturbance. There has been no evidence of depression. His background reveals a number of turbulent and unusual episodes. For example; he acknowledges an illicit love affair with a school teacher at the *634 age of 12. At 15 be joined the Texas National Guard by misrepresenting his age. At 20, following a setback in a love affair, he roamed the world for several years and drank heavily. His first marriage in 1931, ended unsuccessfully- after three years and after his separation from his wife he again began to drink excessively and again his life was disorganized with a good deal of restless activity, wandering and excessive drinking. During the following six or seven years he got into some half dozen scraps probably always on the basis of intoxication. He affirms however that since his second marriage in 1942 he was a complete abstainer up to the time of the present episode. His episode overseas- was at least in part due to his vigorous reactions towards his experiences as Defense Counsel. He has also expressed the opinion that his going around with a number of French women had also contributed to his condition, as he felt quite guilty about that. He ac-know] edges that he had been drinking heavily for about one month. ■ • . .
Initial physical and neurological examinations were negative. A recent X-ray of the chest reveals evidence ■of a tubercular infiltrate in the upper right lung. However, all laboratory tests for activity were negative, and it is the conclusion that this is not an active process at this lime. All laboratory data has been normal.
Officer was presented to Disposition Board at USA General Hospital, Camp Butner, June 5, 1945. The board accepted the diagnosis of simple adult maladjustment, manifested by periodic episodes of emotional instability, excessive alcoholism and disorganized turbulent behaviour,-and recommended that he appear before an Army Retirement Board.
B. After a complete review of the history, physical and laboratory findings the medical witnesses are of the opinion that:
1. Subject officer is incapacitated for active service.
2. The said incapacity is not the result of an incident of the service.
3. The cause of said incapacity is: Simple adult maladjustment, manifested by periodic episodes of emotional instability, excessive alcoholism and disorganized turbulent behaviour.
4. The cause of said incapacity is not an incident of service.
5. The said incapacity originated prior to entrance on active duty in the Army of the United States on 8 September 1922. [sic]
*635 6. The said incapacity is permanent.
7. Further hospitalization will not be of benefit to-him.
8. Subject officer is incapacitated for a reasonable-performance of his duty in peace or war.
This report was signed by both medical witnesses, and Captain Chernak stated before the board that he concurred in the report. Neither medical witness had further testimony to offer. Plaintiff stated he had no questions to ask them,, and further that he did not desire to be called as a witness or-to call any witness or to make an oral or written statement..
The president of the board then asked plaintiff concerning-his last civilian occupation and the extent of time of his last: period of active duty in the Army.
One of the medical officers of the board then asked Captain-. Friedman several questions concerning a recent X-ray which; indicated a lesion on plaintiff’s lung. ■ Captain Friedman-stated that the clinical impression was that the lesion was. inactive, admitted that the presumption was that the lesion must not ha ve been present at entry upon active duty or plaintiff would not have been commissioned, stated that no effort had been made to obtain the X-ray films made at entry upon active duty, admitted the possibility that something had', appeared in the last three years, and in response tó a question, as to whether activity could be determined on the basis of one-X-ray examination, answered that the X-ray had been discussed with a chest consultant who had advised that the lesion was inactive and that plaintiff could be given clearance at this time. Captain Friedman stated that he was not presenting plaintiff for retirement on the basis of chronic bronchitis-but all that should be rechecked later on.
The same medical officer of the board then asked Captain Chernak three questions, and'Captain Chernak testified that: when there are no physical signs of a lesion, diagnosis is made-by X-ray; and that next to actual findings, X-ray is the most: reliable evidence.
26. The findings and decision of the retiring board were asset forth in its record of proceedings, as follows:
The board was then closed for deliberation, and having maturely considered the case finds that Major Morris-B. Brown, O 205 227, TC-AUS, is incapacitated for- *636 active service, that said incapacity is not the result of an incident of service, that the cause of said incapacity is: Simple adult maladjustment, manifested by periodic episodes of emotional instability, excessive alcoholism and disorganized turbulent behaviour, that said incapacity is not an incident of service, that said incapacity originated prior to entrance on active duty in the Army of the United States, on 8 September 1942, having manifested itself on or about 1920, and that said incapacity is permanent.
The president of the board advised the officer before the board of his right to file application for pension.
27. Special Orders No. 106, Army Service Forces, Fourth Service Command, Headquarters Hospital Center, Camp Butner, North Carolina, issued August 16,1945, by command of Brigadier General BEefiebower, contained an order concerning plaintiff, as follows:
43. dr maj morris b brown 0205227 to is granted leave of absence for one (1) month and twenty (20) days effective 18 August 1945 and is relieved from attached unassigned Detachment of Patients Section 1 SCU 1460 US Army General Hospital this station and is attached unassigned to Separation Center Camp Beale Calif (for record purposes only during terminal leave). EDCMB 18 August 1945. Subject Officer will proceed from Camp Butner NC to his home 4843 Agnes North Hollywood Calif so as to arrive thereat not later than 14 October 1945 at which date he will revert to an inactive status due to physical disability. Officer is entitled to WD AGO Form No. 53-98. Temporary promotion or appointment in AUS, if any, of officer will continue in force during period of present emergency and for six (6) months thereafter unless sooner terminated DP. Par. 6 ABr-35-1740 will be complied with. TPA. TDN 601-31 P 431-02 03 07 08 212/60425 S99-999. PCS. Officer will execute WD AGO Form No. 172 if applicable. Auth: WD Cir 109 1945 and WD Cir 188 1945.
Pursuant to this order, plaintiff proceeded to his home at North Hollywood, California, where he resumed his employment with Airdrome Transportation Company, having been elected vice-president while away on active duty.
28. By letter dated September 19, 1945, the Surgeon General advised the Adjutant General as follows:
*637 1. This office does not concur in the findings of the Army Retiring Board convened at U. S. Army General Hospital, Camp Butner, North Carolina, 16 August 1945, in the case of Major Morris Bland Brown, 0-205227, TC-AUS.
2. The board has found this officer permanently incapacitated for active service because of: Simple adult maladjustment.
8. It is the opinion of this office, including the neuro-psychiatric consultant that simple adult maladjustment is not considered a cause for incapacity for active service. The longitudinal history of this officer with nomad-ism, alcoholism, inability to stand stress, is suggestive of psychopathic personality or neurosis of long standing.
4. It is recommended that the record be returned to the board for reconsideration and review of its findings.
By letter dated September 24,1945, the Adjutant General «directed the Army retiring board to reconvene for reconsideration of its findings concerning the plaintiff in view of the remarks of the Surgeon General, copy of which was supplied. This letter further provided:
3. The Board will not proceed with the hearing in the officer’s absence, unless having been duly notified, he waives in writing his right to be present or fails to appear. Any expense incident to such appearance will be borne by the officer.
By registered letter received by plaintiff at his home in North Hollywood, California, on October 9,1945, plaintiff was advised by the Army retiring board that it would reconvene and his case was scheduled for rehearing by the hoard on October 18,1945, at Camp Butner, North Carolina. He was further advised that it would not be necessary for him to appear unless he had further evidence to offer, as all of the facts were available. He was further advised that should he elect to be present at the rehearing, travel would be at his own expense and at no expense to the Government.
Plaintiff signed and returned to the board a form enclosed with the notice of hearing, which stated as follows:
I do not desire to appear before the Army Retiring Board, Camp Butner, N. C., when it is reconvened to further consider my case, and hereby waive all rights to appear.
*638 In waiving bis right to appear at the reconvened retiring board hearing plaintiff was motivated by two factors: (1) He understood that any expense incident to his appearance, including the expense of traveling to North Carolina from California and return, would have to be borne by him; that he would have to engage and pay a lawyer, and pay all the expenses of any witnesses he desired to present. (2) Most of the witnesses which plaintiff could have relied on to help him were still in the Armed Forces overseas and were unavailable to testify at the hearing.
29. On October 23, 1945, the Army retiring board reconvened at Camp Butner, North Carolina, to reconsider plaintiff’s case. This board consisted of five officers, two of them from the Medical Corps. One of the five, not a medical officer, had served on the board which previously had considered plaintiff’s ease. The board met at 11:05 a. m., heard and considered the case, made its decision, and adjourned at 11: 35 a. m. Plaintiff was not present in person nor represented by counsel. His waiver of appearance was before the board. The letters of the Surgeon General and of the Adjutant General, set forth in finding 18, were read to the board. The recorder then submitted all papers referred to the board from the office of the Adjutant General and all allied papers. Two medical witnesses appeared before the board, Captain Friedman, designated as senior medical witness, and Captain Harry H. Ferran, having been appointed due to the leave of absence of Captain Chernak. It does not appear that Captain Ferran, one of the medical witnesses, had ever éxamined the plaintiff. In response to a question as to whether the medical witnesses had any further testimony to offer in view of the opinion of the Surgeon General’s office, Captain Friedman stated that the Surgeon General’s opinion was not clear in his mind, that apparently the criticism was of the diagnosis and not the recommended disposition, that he firmly believed that plaintiff should be and should have been released from active duty, that he could not even recommend inactive status, and that plaintiff was completely unreliable from the standpoint of value to the military service. He further stated that he had no objection if the Surgeon General’s office thought a diag *639 nosis of psychoneurosis of long standing would fit better, but that it was not line of duty, that it existed prior to entry on service, and plaintiff should be out of the Army.
In this connection, it should be noted that the Surgeon General’s office indicated that it thought a diagnosis of “psy-ohopatio personality or neurosis of long standing” was more compatible with the longitudinal history of the officer reported by the medical witness at the first retiring board proceeding, which 'medical history stressed plaintiff’s “nomadism, alcoholism, inability to stand stress.”
The president of the board then asked if any member of the board wished to question the medical witnesses. He then asked Captain Friedman as to the cause of simple adult maladjustment, and Friedman replied that he had no theory or idea as to the cause, but that it was a very marked personality difficulty and character disorder which led plaintiff into excessive drinking, episodes of disorganization, irresponsible behavior and emotional instability, which rendered him completely unable to carry on his duties. He was then asked if he could give a description which would fit into the regulations and be acceptable to the Surgeon General’s office. Friedman then replied that “if desired we can manipulate or fit into terms such as anxiety, depressive reaction, chronic, severe, manifested by disorder of personality and character, excessive alcoholism, disorganized irresponsible episodes, and, as I say again, reaffirming the fact that it has been present for many years, 1920, it is consequently LOD, No; EPTS.”
The findings and decision of this board were as set forth in its record of proceedings, as follows:
The board was then closed for deliberation, and having maturely considered the case, finds that Major Morris B. Brown, 0-205227, TC-AUS, is incapacitated for active service; that said incapacity is not the result of an incident of service, that the cause of said incapacity is: Anxiety, depressive reaction, severe, chronic, manifested by disorder of character and personality, excessive alcoholism, episodes of disorganized irresponsible living, and depressive feelings. Line of duty, No; EPTS; that the cause of said incapacity is not an incident of service; that said incapacity originated prior to entrance on active duty in the Army of the United States, on 8 Sept. *640 42, having manifested itself on or about 1920; and that said incapacity is permanent.
30. By letter dated November 15, 1945, the Surgeon General advised the Adjutant General that his office had reviewed the original and reconvened proceedings of the Army retiring board in plaintiff’s case, and further stated as follows:
2. This office does not concur in the findings of the reconvened board to the effect that this officer is incapacitated for active service by reason of: Anxiety, depressive reaction, severe, chronic alcoholism, episodes of disorganized irresponsible living and depressive feelings..
3. The reconvened board has adherred to the findings of the original board except, as the medical witness explained, “to manipulate (the diagnosis) and fit (it) into terms such as anxiety, depressive reaction, etc.,” with the result that the diagnosis, as now written, is untenable in this case.
4. Attention is invited to action of this office, 19 September 1945, to the Adjutant General.
5. This office does not sanction the practice resorted to by the board in this instance of “manipulating” the diagnosis in order to find this officer incapacitated and. in this manner (rather than administratively) rid the service of a person who in the words of the medical witness, is “completely unreliable from the standpoint of value to the military service — character disorder- — excessive drinking — etc.”
6. It is recommended that Major Morris Bland Brown, 0-205227, TC-AUS, be found not incapacitated, for active service.
By letter dated November 29, 1945, the Adjutant General directed the Army retiring board to reconvene for reconsideration of its findings.
31. On December 18, 1945, plaintiff received notice at his-home in North Hollywood, California, that the Army retiring board would reconvene to hear his case at Camp Butner,, North Carolina, on December 27,1945. He was advised that his attendance would be at his own expense. He signed and forwarded to the board a waiver of appearance, for the same-reasons that impelled his execution of a waiver in connections with the October reconvened retiring board hearing.
*641 32. On December 27,1945, the Army retiring board reconvened at Camp Butner, North Carolina, to reconsider plaintiff’s case. This board consisted of five officers, two from the Medical Corps. None of them had served on the original board, but three of them, including one medical officer, had served on the first reconvened board. The board met at 8:30 a. m., heard and considered the case, made its decision,, and at 9:40 a. m. proceeded to other business. Plaintiff was not present in person nor represented by counsel. His. waiver of appearance was before the board. The letters of the Surgeon General and of the Adjutant General, mentioned in finding 21, were read to the board. The recorder-then submitted all papers referred to the board from the-office of the Adjutant General and all allied papers. Two. medical officers, Major Marcus P. Eosenblum and Captain Julian Kassewitz, testified. Neither had examined plaintiff.
Major Eosenblum had examined the records concerning-plaintiff. He was a qualified and experienced neuropsy-chiatrist. He testified in substance that plaintiff could not. make satisfactory adjustment in and was unfit for military-service, that the diagnosis of plaintiff’s condition could be best described as “psychopathic personality reaction” manifesting “a character and behavior disorder”, that plaintiff’s; condition was a chronic maladjustment and that plaintiff became permanently incapacitated for active service in 1920- and that the cause of plaintiff’s incapacity was “Pathological personality type. Inadequate personality and emotional instability reaction.” Major Eosenblum further testified that plaintiff’s incapacity was not an incident of the service, that there had been no permanent increase in plaintiff’s disability-while on active duty, and that he could not recommend temporary limited service for six months because plaintiff’s-“maladjustment for the next six months would be as defective as the performance of his duties has been in the last few years.”
Captain Kassewitz differed with the testimony of Major-Eosenblum in that in his opinion the diagnosis in plaintiff’s, case “should be constitutional psychopathic state, inadequate personality, which by its very nature, precludes this being an incident of the service, but on the other hand, should defi *642 nitely incapacitate this man for active military service. A •disorder of this nature would most likely have manifested itself no matter what situation this individual found himself in, but certainly could not be called an incident of service.”
Immediately before the closing of the board for deliberations, the president of the board stated as follows:
Three members of the Board now sitting were present at the rehearing of Major Brown on the 23rd of October, 1945, and at that time thoroughly, and sincerely considered this case and were of the opinion that their findings were in consonance with the testimony and there was no effort to manipulate any diagnosis other than to state it in the manner desired and felt that at that time their findings thoroughly protected the government and accurately indicated the evidence that it had before it.
The board’s finding was as follows: “Major Morris B. Brown is not permanently incapacitated for active service.”
No testimony whatsoever was given by either medical witness as to plaintiff’s chronic bronchitis condition.
32. Army regulations 605-250, issued March 28, 1944, as amended by C2 October 11, 1944, govern the composition, powers, and procedure of Army retiring boards, and provide in part as follows:
3. Records supplied. — a. When an officer is ordered before a retiring board the Adjutant General will furnish, for consideration by the board, originals or certified copies of the complete medical history, and of all other official records affecting the health and physical condition of the officer. * * *
* * $ * *
15. Appearance of officer before board; counsel; failure to appear.- — a. Entitled to appear, counsel, mental incompetency. — An officer summoned before an Army retiring board is entitled to appear before the board, with counsel if desired, either civil or military, or both. In every case involving mental incompetency, the officer summoned before the board will be represented by counsel, who will remain in attendance at all board proceedings, and the board will not proceed in the absence of such counsel. In every such case, the appointing authority will appoint military counsel who will act in the absence of other counsel, or as associate counsel, *643 or be excused, according to the desires of the officer summoned before the board, or his personal representative. ■ •
*****
22 * * *
d. Medical officers detailed as witnesses. — After having examined the officer ordered before the board, each medical officer detailed as a witness will submit to the board a report recording the result of his examination on W. D. A. G. O. Form No. 63 (Report of Physical Examination). * * *
Army Regulations 40-1025, issued December 12, 1944, which establish the standards of proof for determining whether a disease or injury existed prior to an individual’s entry on extended active duty, provide in pertinent part as follows:
63. Line of Duty for Disease or Injury.
* * * * *
b. Basic provision for determining line of duty. — A disease or injury, that a militarized person contracts or sustains, while in the active military service of the United States, will be presumed to have been incurred in line of duty, unless there is substantial evidence to show that such disease or injury—
*****
4. Existed prior to the individual’s current active service and was not aggravated by the service (g below). *****

g. Existed prior to individuals current active service and was not aggravated, by service {EPTS).

*****
2. Basic provision. — Irrespective of length of service, an Army patient will be presumed to have been in sound condition upon entering active service, unless the disease or injury, or the conditions which brought about the disease, injury, or death, were noted in the patient’s physical examination upon entrance into the service, or unless clear and unmistakable evidence ((3) below) demonstrates that the injury or disease, or the condition which caused the disease, injury, or death, though not noted, existed prior to the patient’s active service. Further, even if the existence of the condition prior to entering active service has been established, only specific findings of “natural progress” of the disease or injury, *644 based on well-established medical principles, are able to overcome the presumption of service-aggravated ((4) below). This provision will serve as a basis for judging line of duty in all cases, on or after 7 December 1941, and before the termination of hostilities incident to the present war. * * *
*****
5. PhsycMatrio oases.
■ (a) In line of duty. — The following cases will be considered to be in line of duty irrespective of length of service:
1. Cases of * * * psychoneurosis occurring in individuals in whom no evidence of the disorder in question existed prior to entry in service.
2. Cases of * * * psychoneurosis occurring in individuals in whom predisposition to these diseases, but not the actual disease itself, existed prior to entry in the service. * * *
3. Psychiatric conditions occurring in individuals in whom such conditions existed prior to entry into the service, but where there is evidence to show that the disorder has been aggravated by the service. * * *
(b) Not in lime of duty. — The following cases will be considered to be not in line of duty: cases of * * * psychoneurosis where available evidence clearly indicates the existence of the disease prior to entry into the service, and that the disease was not aggravated by the service.
33. By letter dated March 7, 1946, plaintiff was advised by the Adjutant General by order of the Secretary of War that the findings of the Army retiring board recommended in his case on December 27, 1945, were approved by the War Department, and that plaintiff was not entitled to retirement pay benefits and would not be recalled to active duty.
34. By telegrams transmitted May 15 and 26, 1947, plaintiff requested the Adjutant General to grant a rehearing of his case by an Army retiring board. These requests were denied on June 4,1947.
By letters dated May 29 and June 10,1947, plaintiff made further requests for appearance before an Army retiring board, and submitted statements of several physicians, concerning plaintiff’s chronic bronchitis and his psychiatric con *645 dition and their opinion of the probable dates of inception. These requests and documents were referred on June 26, 1947, by the Adjutant General to the Surgeon General for remarks and recommendations. On July 1, 1947, the Surgeon General advised the Adjutant General that evidence in plaintiff’s records revealed that he might be incapacitated by reason of psychoneurosis, that such incapacity was not considered to be incident to service as it existed prior to active duty, and that it was recommended that plaintiff not appear before an Army retiring board.
The plaintiff’s requests of May 29 and June 10,1947, were denied by order of the Secretary of War on July 8, 1947.
35. From early fall of 1945 until May 15, 1947, plaintiff was employed by Airdrome Transport Company in which, as pointed out above, he . served as vice-president. During this time, plaintiff considered himself to be in good health except for the last month or two when he began to approach the stage of another nervous breakdown. In the hope that a change of scene and duties would be beneficial to the plaintiff, his company sent him on an extended tour East on company business, but the relief experienced on this occasion was only temporary. When he returned, plaintiff recognized signs of marked irritability, stiffness of his neck muscles, and inability to cope with ordinary difficulties and problems. On the advice of his private physician, he resigned his employment and underwent physical examinations and psychiatric observation at a private hospital for a few days. Thereafter, until September 1947 he was given psychiatric treatments by a private psychiatrist. In July 1947, plaintiff was granted 30 percent disability by the Veterans Administration for service-connected chronic bronchitis, payments effective from May 17, 1947. In September 1947 plaintiff was admitted to the Veterans Administration Neuropsychia-tric Hospital, Brentwood, California, and for about seven weeks underwent observation, diagnosis, evaluation, and treatment for his nervous disorder. Subsequently in 1947, plaintiff was granted an additional 10 percent disability rating by the Veterans Administration for service-connected anxiety reaction, which rating was raised to 30 percent about 3 or 4 months later in early 1948. Since that time plaintiff *646 has been receiving disability compensation from the Veterans Administration on a combined rating of 50 percent disability, derived from a 30 percent rating for chronic bronchitis and 30 percent for anxiety reaction, both service-connected.
Plaintiff has received considerable out-patient treatment by the Veterans Administration for his psychoneurotic condition.
36. The Keport of the Neuropsychiatric Examination concerning the plaintiff, prepared in October 1947, at the Neuro-psychiatric Hospital of the Veterans Administration, stated in part as follows:
In an evaluation of this case, it was felt that this patient’s condition was aggravated and precipitated by his experiences in Paris where he was Defense Counsel on a general Courts Martial. The patient identified strongly with all defendants and the responsibility of his position was too much for him. The patient was evacuated to the states and here, after rather prolonged hospitalization without treatment, he was retired from the service. In review, it is felt that this patient’s condition was precipitated by his responsibilities and his environment and would, therefore, be consistent with what has been called operational fatigue or combat fatigue when applied to service men in other situations. It is, therefore, surprising that this man was not reassigned in the Zone of the Interior instead of being, retired. His past service record and his longitudinal history indicate that this man has always performed his military duties adequately and in almost a compulsive perfectionistic manner which is not in keeping with the diagnosis of psychopathic personality. It is felt that this will not seriously incapacitate this patient for future occupation. Psychotherapy has been advised and the patient has indicated his willingness to receive such treatment.
DIAGNOSIS: Anxiety reaction
(a) Chronic, moderate
(b) External precipitating stress is moderate by duties as defense counsel in general courts martial, Nov. 1944.
(c) Predisposition: Moderate
(d) Estimated resultant incapacity: Moderate.
Prognosis: Good with treatment
Competency : Competent. [Emphasis supplied.]
*647 37. Pursuant to section 302 of the Servicemen’s Readjustment Act of 1944, as amended, plaintiff made application to the Army for a review of his release from active duty. By registered letter dated March 31,1948, he was notified that his case would be heard by the Army Disability Review Board on May 4,1948, at Washington, D. C.
On the date set, this board met at 1:00 p. m., heard and considered plaintiff’s case, made its findings and reached its decision, and adjourned at 6:15 p. m. The board was comprised of five officers, two of whom were from the Medical Corps. None of them had been on any of the Army retiring boards which had previously considered plaintiff’s case. Plaintiff appeared in person and was represented by counsel furnished by the American Legion, which acted under a power of attorney given by plaintiff. The examiner orally presented the case to the board and submitted a written summary prepared by another officer.
The examiner then read to the board from the records of proceedings of the three Army retiring boards and from the letters of the Surgeon General and the Adjutant General, pertaining thereto; from statements of various physicians and psychiatrists who had observed and treated plaintiff; from statements of acquaintances of plaintiff; from correspondence between plaintiff and the Adjutant General concerning plaintiff’s requests in 1947 for a new Army retiring board, and statements of the Surgeon General pertaining to such requests; and from reports of physical examination of plaintiff for enlistment in the Air Corps, dated February 4, 1926, and for temporary appointment as a captain, dated January 1 and August 13, 1942, including neurological and psychiatric examinations. The reports of these physical and psychological examinations showed that plaintiff was in sound health mentally and physically upon his entry on extended active duty on September 8, 1942. The examiner advised the board that the reports of physical examinations of plaintiff in connection with peacetime army services from October 18,1924, to June 5,1938, were not presently available. The examiner did not explain why the reports of plaintiff’s physical examinations were not available. They were available for presentation in this court proceeding. The exam *648 iner then read from, records of proceedings of the Disposition Board at Paris, France, February 10, 1945, and of the Disposition Board at Camp Butner, North Carolina, June 5, 1945; from reports of various physical and neuropsychiatric examinations of the plaintiff conducted by the Veterans Administration in June, August, September and October 1947; which reports indicated that plaintiff was suffering from service-connected chronic bronchitis, moderate, and service-connected anxiety reaction, moderate; from plaintiff’s WD AGO form 0258-1, dated September 15, 1947, and from his form 66-1, the latter of which indicated in excess of 24 months of service in grade of major, during which time all of his performance ratings were excellent. The examiner then rested the presentation of the case to the board.
The president then asked if any member of the board desired to ask any questions in clarification of the record, to which question there was no response. The president then asked plaintiff’s counsel if he had any objections to any statements made by the examiner in presenting the record. Plaintiff’s counsel pointed out two corrections pertaining to the nature of plaintiff’s employment immediately prior to entry on active service, and stated that to be the only objection. Plaintiff’s counsel then submitted in evidence written statements of the qualifications of three private physicians whose statements concerning plaintiff were before the board. The report of Dr. John D. Moriarty to the contact office of the Veterans Administration in Los Angeles, California, is typical of the three reports and read in part as follows:
7. Summary and Conclusions: Stripping the case of technical terminology and pedantic opinions, I may say that the actual picture of this man’s illness is that of a moderately severe emotional sickness which developed in a reasonably well integrated and stable person under the stress of overseas duties and unusual responsibilities, such as serving as an important supply officer in the Battle of the Bulge and as a special defense counsel in general courts-martial cases. Formal diagnosis is then, in my opinion, psychoneurosis, mixed type. I am of the firm opinion that this did NOT exist prior to the patient’s going on active duty and that it WAS incurred in line of duty. I further believe that he is permanently unfit *649 for active duty as a result of the aforementioned disability.
Plaintiff then presented the oral testimony of two officers who had served with him on active duty between 1942 and 1945, who testified that throughout that period until December 1944 plaintiff performed his duties in an excellent manner and was a responsible and stable individual; that during that time he was a total abstainer from alcoholic liquor until his sudden breakdown in December 1944; and that plaintiff’s breakdown was caused by being overloaded with the work of the transportation assignment and with the mental and physical strain of serving as defense counsel before the general court-martial. Plaintiff also called a psychiatrist who had interviewed plaintiff three times and read the records of proceedings before the three Army retiring boards, and who testified that plaintiff was not a psychopathic personality; that according to his information the first evidence of psychoneurosis in plaintiff occurred either in December 1944 or January 1945, and that the proper diagnosis was psychoneurosis, mixed, type, moderate, caused by his military service.
Plaintiff’s counsel then read to the board from various documents which were marked in evidence as exhibits, including among others, statements and affidavits of fellow officers and former associates and acquaintances of plaintiff. These statements and affidavits uniformly describe plaintiff as a stable, organized, and well adjusted individual; as a good employee, fellow officer, or commanding officer under whom the author of the statement or affidavit had served. The tone of most of these statements and affidavits indicated respect and affection for the plaintiff, and all were unanimous in stating that prior to the winter of 1943 plaintiff had evidenced none of the symptoms of bronchitis that later became chronic, and that prior to December of 1944 plaintiff had exhibited no symptoms of nervous disorder or poor adjustment to military life.
Plaintiff was then sworn and examined. He testified at length concerning his schooling, occupational experiences, and active service in the Army. With respect to the notation in his records that he had been twice arrested for intoxica *650 tion, plaintiff testified that be went to the Los Angeles Police Department, secured the information, and voluntarily stated the facts in connection with his application in 1942 for a temporary commission. He explained that he could not recall the exact circumstances but the arrests occurred because of noise and disturbance arising out of drinking parties in which he had engaged prior to his second marriage. He also stated he had been fined twice for speeding prior to 1942. He stated that from December 1941 to December 1944 he had totally abstained from drinking alcoholic beverages. After explaining his work in the Transportation Corps and his detail as special defense counsel, he stated that he first began to feel strain and tension in the latter part of November 1944, and commenced to drink alcoholic liquor in December 1944 after it had been suggested at the dispensary that he go on a “binge.” He then related his subsequent experiences and hospitalizations in France and the fact of his return to and hospitalization in the United States. He stated that upon his release from active duty he resumed his employment at Airdrome Transport Company, Burbank, California, as operations manager, and at first seemed greatly improved in his health, but later began to experience loss of appetite, nausea, worry, and irritability, and in May 1947, resigned because of his health.
Plaintiff further testified that he first experienced a condition similar to bronchitis when he was hospitalized in 1943 while on active duty at Camp Tyson, Tennessee. He stated that he currently suffered from coughing and was susceptible to attacks involving his lungs. Thereupon, a discussion occurred between a board member, plaintiff and plaintiff’s counsel concerning the radiologic report of November 23, 1943, quoted in finding 12, and particularly with the reference to the phrase “compatible with an old bronchitis with pleural adhesions.” The president of the board observed that the physical examination of January 1, 1942, stated plaintiff’s lung fields to be clear, but it was indicated that there was evidence of healed primary type pulmonary tuberculosis.[4] Plaintiff’s counsel then observed that the same *651 report showed diaphragmatic surfaces smooth and the costo-phrenic angles normal. When asked as to when he first started drinking, plaintiff replied that it was when he was in high school, perhaps about 18 years of age, when he thought it was smart to drink corn liquor on the weekends. At the time of his testimony before this board, plaintiff was a student at the University of Virginia, studying a course preparatory to the admission to the law school there.
In evidence before the board, the statements and affidavits of various physicians and psychiatrists who had observed and treated plaintiff expressed opinions to the effect that plaintiff was permanently incapacitated for active service by reason of psychoneurosis and chronic bronchitis, and that both conditions were the result of plaintiff’s active military service after entry upon duty in September 1942.
In evidence before the board were statements and affidavits of persons acquainted with plaintiff prior to 1944, including among others, officers who had served with plaintiff during the period 1942 to 1944. These expressed generally one or more of the opinions that plaintiff was in sound health physically and mentally prior to his entry on active duty in 1942, that he was a stable and excellent officer until December 1944, and that thereafter he was highly nervous and strained.
Before the closing of the board for deliberation, plaintiff’s counsel made a brief argument during which he commented that the 1943 X-ray report admittedly indicated bronchitis, but that neither of plaintiff’s 1942 examinations indicated such disability, and since X-ray films, taken in connection with these examinations, were not in evidence, it was necessary for the board to concede service-connection for bronchitis. Upon inquiry of the president of the board, the examiner stated that there were no X-ray films of the plaintiff available whatsoever.
38. The findings, rulings, and decision of the Army Disability Review Board were set forth in its record of proceedings, as follows:
After a careful review of the findings of the Army Retiring Board and the administrative action subsequent thereto in the case of Major Morris B. Brown, *652 0-205227, TC-AUS, the findings and subsequent administrative action affirmed or reversed are as hereby specified:
Findings of Army Retiring Board, 16 August 19J¡6:

Findings Affirmed:

1. That Major Morris B. Brown is incapacitated for active service.
2. That said incapacity is not the result of an incident of service.
3. That said incapacity is not an incident of service.
4. That said incapacity is permanent.

Findings Reversed or Amended:

1. That the cause of said incapacity is: Simple adult maladjustment, manifested by periodic episodes of emotional instability, excessive alcoholism and disorganized turbulent behavior.
2. That said incapacity originated prior to entrance on active duty in the Army of the United States, on 8 September 1942, having manifested itself on or about 1920.

Administrative Action:

Administrative Action Affirmed:

None.

Administrative Action Reversed:

The approval by the Secretary of War dated 4 March 1946 of the findings of the Army Retiring Board dated 27 December 1945.

Fundings of Army Disability Review Board:

1. That Major Morris B. Brown is incapacitated for active service.
2. That said incapacity is not the result of an incident of service.
3. That the cause of said incapacity is: Psychoneurosis, mixed type, chronic, moderate.
4. That said incapacity is not an incident of service.
5. That said incapacity originated some time prior to entry on EAD.
6. That said incapacity is permanent.
7. That said incapacity has not been permanently aggravated by military service.
8. That officer’s disability was not incurred in combat with an enemy of the United States nor did it result from an instrumentality of war in line of duty.

*653
Conclusions:

1. The symptoms complained of and physical findings recorded while on active commissioned service are recurring episodes of a pre-existing disability, not beyond the natural progress thereof, and do not constitute permanent aggravation.
2. No permanent incapacity from bronchitis has been established.

Directions:

The Secretary of the Army directs:
1. That The Adjutant General initiate appropriate administrative action and thereafter notify the applicant and his counsel of the final action of the President.
2. That this board be advised when such action has been completed.
39. By letter dated June 28, 1948, the Adjutant General advised plaintiff as follows:
As a result of Army Retiring Board proceedings it was found that you were not permanently incapacitated for active service.
In consideration of your application, the Army Disability Review Board, established under authority of Section 302, Public Law 346 — 78th Congress, approved 22 June 1944, has carefully reviewed the findings and decisions of the Board [sic] Retiring Boards in your case. The Secretary of the Army has instructed me to advise you that as a result of this review, you are considered to be permanently incapacitated for active service and that the incapacity is not the result of an incident of service.
40. On October 19, 1950, plaintiff applied to the Army Disability Review Board for a rehearing of his application for review of his release from active duty, submitting in support thereof additional affidavits, statements and letter of several physicians and psychiatrists who had examined, diagnosed, and treated plaintiff for chronic bronchitis and psychoneurosis from 1948 to 1950; further affidavits of military officers who served with plaintiff during the period from 1942 to 1945, stating that plaintiff’s performance of duty prior to December 1944 was excellent, some of which officers had not been the authors of such statements previously submitted in evidence before the board; affidavits of additional persons *654 who bad been acquainted with plaintiff and stated tbat he was a stable and healthy person prior to entry on active duty in 1942; and a report of a physical examination of plaintiff given by his Selective Service Board on August 20,1942, and of one given by the Army on February 11, 1944, both of which stated that plaintiff’s respiratory and nervous systems were normal.
41. Plaintiff’s application for rehearing was denied, and he was so notified by letter from the Adjutant General under date of January 5,1951, as follows:
This is in reference to the application submitted for a rehearing of your case by the Army Disability Beview Board, established under the provisions of Section 302, Public Law 346 — 78th Congress, as amended.
Careful consideration has been given to the application and the additional evidence submitted and it has been determined that no new, pertinent and material evidence has been presented bearing on your case which, if considered at the time the case was originally heard, would have caused a different finding to be made. Therefore, your request for a rehearing is denied.
42. In the trial of this case before this Court, three medical witnesses were called and testified in behalf of plaintiff regarding his conditions of psychoneurosis and bronchitis.
Dr. John D. Moriarty, a specialist in psychiatry and neurology at Los Angeles since 1946, testified that plaintiff had been a patient of his since 1947; that he had treated plaintiff 90 to 100 times prior to the date of his testimony on July 23, 1953, with treatments occurring in 1947, 1948, 1949 and 1953, the omitted years being the time when plaintiff was absent from Los Angeles and residing in the eastern United States; that in 1947 he diagnosed plaintiff’s condition as psychoneurosis, mixed type, characterized by tension, nervousness, insomnia, gastric intestinal disturbances, anxiety, depression, and other allied symptoms; that this diagnosis remained the same at the time of his testimony; that he had served as a Navy psychiatrist on active duty in various Navy hospitals from November 1943 to January 1946; that it was his opinion that plaintiff was permanently incapacitated for active duty by reason of psychoneurosis, mixed type; that the disability did not exist at the time of *655 plaintiff’s entry on active duty in September 1942; that he had found no evidence from plaintiff’s history of a predisposition toward psychoneurosis; that in his opinion the onset of plaintiff’s disability was in November or December 1944; that plaintiff’s services as a Transportation Corps officer and as defense counsel in the courts-martial had acted as the precipitating stress which resulted in the psychoneurotic illness appearing, and that other factors had entered into the illness during the last nine years so that it was a chronic illness; and that in his opinion plaintiff would not have developed psychoneurosis except for his extended active duty in the Army.
Dr. Moriarty had prepared a report for the Contact Office of the Veterans Administration in Los Angeles which expressed the same opinion as to plaintiff’s incapacity and its origin during his extended active duty in World War II. This report was in evidence for consideration by the Disability Beview Board in May 1948. Dr. Moriarty had also prepared an affidavit containing much the same material and plaintiff had submitted this affidavit to the Disability Beview Board in support of his application for a rehearing discussed above.
Dr. Frank H. Holland, a physician engaged in general practice at North Hollywood, California, testified that he first examined plaintiff in May 1947; that in collaboration with Dr. Morrow he had plaintiff hospitalized at that time for consultation regarding a chronic lung condition and a neuropsychiatric disorder; that in his opinion plaintiff was permanently incapacitated by reason of chronic bilateral bronchitis; and that in his opinion, based upon the assumption that plaintiff entered active service in 1942 with a chest X-ray interpretation satisfactory for entry upon active duty, plaintiff’s chronic bronchitis did not exist prior to September 1942, but was incurred as a result of bouts of acute bronchitis for which he was hospitalized on two or three separate occasions during his active service.
Dr. Holland had submitted a statement dated August 8, 1947, which was introduced in evidence before the Disability Beview Board in May 1948 and an affidavit dated October 13, 1949, which was submitted by plaintiff in support of his *656 application for a rehearing by the Disability Review Board. Both the statement and the affidavit expressed the same views as those expressed during Holland’s testimony in this court.
Dr. James J. Morrow, a physician and surgeon engaged in the practice of general surgery at and near Los Angeles, California, testified that he first met plaintiff in November 1945 in connection with a referral from another physician on the question of existence of acute appendicitis; that he saw plaintiff intermittently for about two years until 1947; that he had referred plaintiff to Dr. Moriarty for a psychiatric examination; that he had served as chief surgeon at the station hospital at Fort Leavenworth, Kansas, during World War II, and was familiar with the proceedings of Army retiring boards; and that in his opinion based on the history furnished by plaintiff, plaintiff’s condition of chronic bronchitis occurred some time between his physical examination for entry upon active duty, the chest X-ray report of which showed negative findings in August 1942, and the time in November 1943 when plaintiff was on active duty and was admitted to a hospital, at which time the report of X-ray examination showed evidence of a bronchial condition.
A signed statement of Dr. Morrow submitted and offered in evidence before the Disability Review Board in 1948, had set forth the same facts and expressed the same opinion regarding the origin of plaintiff’s chronic bronchitis as in his oral testimony before this court.
43. Following plaintiff’s resignation from his employment with Airdrome Transport Company in 1947, plaintiff was unemployed until June 1949 when he became tour director for the musician Rubinoff. In the meantime, he had been a student at the University of Virginia from February to August 1948, and a student in the Loyola University School of Law, Los Angeles, from September 1948 to June 1949. While arranging appearances for Rubinoff, plaintiff and his wife stopped at Alexandria, Virginia, on October 16, 1950, when plaintiff decided because of his health and because of his belief that he could earn a better living, to file an application for a position with the National Production Authority in Washington, D. C. There was delay in processing of the *657 application, but on March 6, 1951, plaintiff was employed as an industrial analyst in the field of transportation. He continued in this position until January 2, 1953, when his position was terminated due to reduction in force. Plaintiff then returned to Los Angeles and was unemployed until June 1953 when he worked for a short period in a clerical capacity for one company and then transferred to a commission assignment as automobile salesman for a Ford automobile agency, in which position he was employed at the time of the trial in this case. Plaintiff has continued to receive treatments and some additional hospitalization for chronic bronchitis and psychoneurosis through facilities and arrangements of the Veterans Administration.
CONCLUSION OE LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is entitled to recover and judgment will be entered to that effect. The amount of recovery will be determined pursuant to Eule 38 (c).
In accordance with the opinion of the court and on a memorandum report of the commissioner as to the amount due thereunder, it was ordered on January 16, 1959, that judgment for the plaintiff be entered for $25,259.29.

 There is some confusion in the record about the length of time consumed by this particular voyage and also the length of time that plaintiff spent in Genoa, Italy. Captain Friedman, the medical witness who had examined plaintiff briefly while he was hospitalized prior to the Retiring Board proceedings in 1945 and who testified in those proceedings, testified that plaintiff spent approximately a year in Genoa. Dr. Roger Cohen, plaintiff’s witness before the Disability Review Board in May 1948, testified to the same effect. Captain Friedman was not called as a witness in the proceeding before the Trial Commissioner of this court and the plaintiff testified that he spent only a month in Genoa. Dr. Cohen’s testimony before the Disability. Review Board was generally somewhat hazy and inaccurate with respect to many concrete facts and this is indicated by a comparison of his testimony with documentary evidence in the ease. The documentary evidence in the case bears out the fact that plaintiff could not have spent much more than a month in Genoa. It seems reasonable to conclude that if plaintiff told Captain Friedman that he spent a year in Italy in 1980 and 1931 he was himself confused. This statement was supposed to have been made while plaintiff was hospitalized in 1945 in' the united States Army General Hospital at Camp Butner, North Carolina. During that period of hospitalization plaintiff appears to have been in a very disturbed condition and not responsible for the accuracy of statements he might have made.

 Tie physical disability -which plaintiff claims he incurred while serving on active duty between 1942 and 1945, is chronic bronchitis. Accordingly, the mention in this report of evidence of “healed primary type pulmonary tuberculosis” which has never again become active, is without significance.

 Captain Friedman was not called as a witness in the instant proceeding. Plaintiff testified that Captain Friedman wished to know only the “bad things” that had happened to plaintiff during the course of his life. Plaintiff indicated that in his opinion the interview was very superficial and that Captain Friedman was mostly concerned with plaintiff’s drinking habits. Plaintiff testified that he had told Captain Friedman that he had only been.drunk on ia very few occasions; that until he became ill in France in parly 1945, he had never done any drinking alone and that previously his drinking had all been fairly moderate social drinking. Plaintiff did not appear to blame Captain Friedman for the lack of attention received by plaintiff at the hospital and remarked that Captain Friedman was at all times a very busy and harassed man.

 As noted elsewhere herein, evidence of healed primary type pulmonary tuberculosis would have no bearing on a bronchial condition such as plaintiff incurred.